# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 12, 2010 Session

## STATE OF TENNESSEE v. KENNETH MILLER AND RAY JUNIOR TURNER

**Appeal from the Criminal Court for Davidson County**
**No. 2007-D-3535      Cheryl Blackburn, Judge**

---

**No. M2008-02267-CCA-R3-CD - Filed April 22, 2010**

---

The Defendants, Kenneth Miller and Ray Junior Turner, were convicted by a Davidson County jury of conspiracy to deliver 300 grams or more of cocaine and delivery of 300 grams or more of cocaine. Additionally, the Defendant Miller was found guilty of possession with intent to deliver 300 grams or more of cocaine. All convictions are Class A felonies. See Tenn. Code Ann. § 39-17-417(j)(5). Following a sentencing hearing, the trial court sentenced the Defendant Miller to an effective sentence of one hundred and twenty years as a Range II, multiple offender; the trial court ordered all three of his forty-year sentences to be served consecutively to one another. As for the Defendant Turner, the trial court imposed an effective sentence of sixty years as a career offender, running both of his sixty-year sentences concurrently with one another. On appeal, the Defendant Miller presents the following issues for our review: (1) whether the trial court erred in not suppressing the evidence gathered via wiretaps; (2) whether it was error to allow a State's witness to "field-test" a substance found on an exhibit; (3) whether the evidence was sufficient to support verdicts for conspiracy and delivery of 300 grams or more of cocaine; and (4) whether the trial court committed sentencing errors. The Defendant Turner, in addition to challenging the sufficiency of the evidence in support of his convictions, argues that: (1) the trial court erred by admitting into evidence certain "drug ledgers" found in his apartment; and (2) the telephone calls intercepted during the wiretap investigation, purported to contain the Defendant's voice, were, in fact, inadmissible hearsay. After a review of the record, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Kenneth Miller, and Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Ray Junior Turner.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; John Zimmerman and Andrea Green, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Factual Background

This case results from an ongoing drug investigation involving the Defendants. A Davidson County grand jury issued a superseding indictment[1] on December 13, 2007, charging the Defendants Miller and Turner with conspiracy to deliver 300 grams or more of cocaine; the Defendants Miller and Turner with delivery of 300 grams or more of cocaine; the Defendant Miller with possession with intent to deliver 300 grams or more of cocaine; the Defendant Miller with possession with intent to deliver 26 grams or more of cocaine in a school zone; and the Defendant Miller with delivery of 26 grams or more of cocaine. A jury trial was held on May 20-21, 2008. The jury was unable to reach a verdict on the charges against the Defendant Miller for possession with intent to deliver 26 grams or more of cocaine in a school zone and delivery of 26 grams or more of cocaine; therefore, we will not recite the evidence as it relates to those charges.

We will summarize the proof in the light most favorable to the State. Agent Shelly Smitherman, with the Tennessee Bureau of Investigation ("TBI"), testified that she was the agent in charge of the investigation involving the Defendants, which began in December 2005. Agent Smitherman obtained a wiretap order allowing her to intercept the Defendants' phone calls; she explained that agents in the wireroom listened to the phone calls and that they would relay pertinent information to officers in the field conducting surveillance of the Defendants.

Through intercepting these phone calls, it was determined that a drug deal was to take place on March 24, 2006, at the Rivergate Mall. The Defendant Miller was to deliver a kilogram ("kilo") of cocaine to an unidentified individual coming from Kentucky. Police conducted surveillance of the Defendant Miller throughout the day. At 11:34 a.m. on this day, the Defendant Miller phoned the Defendant Turner and asked him to "come and drop

---

[1] The initial eight-count indictment was returned on June 20, 2006, and included co-defendants, Cory Montez Crawford, Kavares Chakan Davis, Tommie Lee Griffin, Gregory Antonio Sweeny, and Ned Wayne Thompson.

it off." TBI Special Agent Steve Talley testified that Kavares Davis ("Davis") arrived at the Defendant Miller's apartment at 1:34 p.m. At 1:47 p.m., officers observed the Defendant Turner, along with two other individuals, arrive at the Defendant Miller's apartment. The Defendant Turner went inside the residence through the garage door. After his arrival, the blinds were closed. A few moments later, the blinds were reopened, and the Defendants and Davis exited the apartment and stood out front talking for a time. Around 2:50 p.m., the Defendant Turner and Davis left the residence.

Around 6:30 p.m., officers observed the Defendant Miller leave his apartment in his black Chevrolet Impala, heading toward the Rivergate area. When he arrived at the mall, the Defendant went inside the food court area and purchased some cookies. He received a call from Davis and then returned to his vehicle. The Defendant drove to the food court entrance, and a man got inside the vehicle. They drove around to the other side of the mall and parked near a green Pontiac Grand Am with Kentucky tags. Detective Herbert Kajihara, with the Twentieth Judicial Drug Task Force, saw the man who had been in the Defendant Miller's car walk back toward the mall. After the Defendant Miller left, Det. Kajihara continued to observe the Kentucky vehicle. He then saw the same man exit the mall, along with another male and a female juvenile, and get inside the car. The individuals were carrying packages.

Officers followed the green Pontiac to a gas station. At the gas station, an individual later identified as Ned Wayne Thompson ("Thompson"), got out of the vehicle and placed something that looked like a bag in the trunk. When Thompson left the gas station, the vehicle proceeded onto Interstate 65. Although radar was not used, Officer Michael Wilson of the Metropolitan Police Department paced the vehicle traveling 80 miles per hour in a 70 mile-per-hour zone. Officer Wilson stopped the vehicle. The State did not want to compromise the wiretap investigation, so the officers proceeded under the auspice that they were stopping the individuals for a traffic violation, and they obtained probable cause to search the vehicle due to a K-9 alert. Hidden behind carpeting inside the trunk, officers discovered two separately packaged bricks of cocaine, weighing approximately two kilograms.

Officers then procured search warrants for the Defendants' residences. During the search of the Defendant Miller's residence, police recovered: one kilo of cocaine from the kitchen; 124.5 grams of cocaine found inside a shoe box in the bathroom; $13,000 in cash from the safe; a notebook with drug ledgers, including names; some nine millimeter rounds for a handgun; and "gunk cans" containing cocaine. Officers also found items used to prepare the cocaine for resale—digital scales, a "kilo press," plastic baggies, and a "cutting agent" used to break down cocaine. The Defendant Miller also used a video camera to monitor the parking lot in front of his apartment. At the Defendant Turner's residence, Agent Talley was in charge of collecting evidence. Evidence collected included five

notebooks containing drug ledgers found in the kitchen garbage can, digital scales, a vacuum bag sealer, two loaded handguns, a "kilo press," and a "cutting agent."

Kavares Davis, initially a co-defendant in this case, testified that he had entered a guilty plea to possession of .5 grams or more of cocaine and received an eight-year sentence under the terms of the agreement. Davis affirmed that the Defendant Turner was his uncle and that the Defendant Miller was his cousin. The Defendant Miller supplied him with cocaine at the time of his March 2006 arrest and had done so "off and on" for two or three years. In November or December 2005, Davis told the Defendant Miller that he did not like dealing with the Defendant Turner because of his high prices, $20,000 for a kilo of cocaine; however, the Defendant Miller continued to deal with the Defendant Turner.

Davis went to the Defendant Miller's apartment on the evening of March 23, 2006. The Defendant Turner was already there; he had brought three bricks or kilos of cocaine for the Defendant Miller, which were sitting on the table. The Defendant Miller said one of the kilos was "bad," and the Defendant Turner promised to replace it with another one the next day. The Defendant Turner took the "bad" kilo with him when he left.

According to Davis, the Defendant Turner showed up the following morning with two other men. Davis was already there because he and the Defendant Miller were supposed to go get something to eat. Davis went downstairs to let the Defendant Turner in through the garage. The Defendant Turner went upstairs, but Davis stayed downstairs. Davis testified that the Defendant Turner was dropping off the new kilo of cocaine, which he had in his arms. The Defendants then came back down to the basement, and all three men exited and stood outside talking for a while.

Later that day, the Defendant Miller asked Davis to follow him to Rivergate Mall to meet Thompson, aka "Kentucky." Davis phoned the Defendant Miller who was in the food court area of the mall; the Defendant Miller stated he was "waiting on them to get done eating." Davis made plans to meet the Defendant Miller at a Mapco gas station following the exchange. After they met at the gas station, they proceeded to the Defendant Turner's residence, where only the Defendant Miller went inside. About five minutes later, he came back out to the car and grabbed a bag, which he stuffed in his coat, and went back inside. Later that evening, Davis and the Defendant Miller were arrested at a Mexican restaurant in Hermitage.

Previously, on March 10, 2006, Agent Smitherman saw Davis place a trash bag in the dumpster of the Defendant Miller's apartment complex. Agent Smitherman pulled the trash and found three empty plastic "kilo wrappers," rubber gloves, a "cutting agent," and a sheet of paper showing a drug ledger. Additionally, on March 10, officers in the wireroom began

listening to numerous conversations involving the Defendants, wherein the Defendants used code words for exchanging drugs and money.

Following the conclusion of the proof, the jury found both of the Defendants guilty of conspiracy to deliver 300 grams or more of cocaine and delivery of 300 grams or more of cocaine. The Defendant Miller was also found guilty of possession of 300 grams or more of cocaine with the intent to deliver.

A sentencing hearing was held on July 16, 2008. The trial court sentenced the Defendant Turner to two concurrent terms of sixty years as career offender. As for the Defendant Miller, the trial court enhanced his sentence on each conviction to forty years as a Range II, multiple offender. The trial court then ordered all three of these sentences to be served consecutively to one another, for a total effective sentence of one hundred and twenty year.

The Defendants timely filed motions for a new trial. This appeal followed.

## I. Wiretap Evidence[2]
### A. Neutral and Detached Magistrate
The Defendant Miller challenges the evidence obtained via the wiretap order, contending that the trial court erred by failing to suppress said evidence because the wiretap order was not issued by a "neutral and detached magistrate." "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's applications of law to fact de novo, however. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from such evidence." Odom, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Wiretapping and Electronic Surveillance Act, Tennessee Code Annotated section 40-6-301 to -311, allows certain judges to issue orders authorizing interception of wire, oral, or electronic communications upon the application of law enforcement. Tenn. Code Ann. § 40-6-304. The application must include the following:

---

[2] For the purposes of clarity and brevity, we have reordered the issues as presented by the Defendants' in their respective briefs.

(1) the identity of the applicant officer and the district attorney general authorizing the application;

(2) a full and complete statement of the facts relied upon by the applicant, including details of the offense, a description of the facilities from which the communications are to be intercepted, a description of the type of communication sought to be intercepted, and the identity of all known persons committing the offense and whose communications may be intercepted;

(3) a statement of the time period during which the interception must be maintained; and

(4) a statement of facts concerning any previous applications.

Tenn. Code Ann. § 40-6-304(a). The application also must contain "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Tenn. Code Ann. § 40-6-304(a)(3).

The Defendant Miller contends that the judge who issued the wiretap order, Judge Monte Watkins, was not a "neutral and detached magistrate." The basis for his contention is that Judge Watkins, prior to becoming a judge, represented him in a criminal action involving cocaine and, therefore, Judge Watkins had likely surmised that the Defendant was guilty of the charges alleged in the wiretap application. The State first argues that the Defendant has waived this issue for failing to raise it in his motion for new trial. Additionally, the State contends that plain error review is not warranted because a clear and unequivocal rule of law has not been breached. The State also notes that the Defendant has failed to include a transcript of the motion to suppress hearing and a copy of the wiretap application in the record on appeal.

Generally, issues are waived if they are not presented in a motion for a new trial. See Tenn. R. App. P. 3(e); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). Therefore, this Court may only review the issue for plain error. See Tenn. R. Crim. P. 52(b) (providing that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time"). To recognize the existence of plain error, this Court must find each of the following five factors to be present:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (adopting the factors first articulated in State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[A] complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing Smith, 24 S.W.3d at 283).

Initially, we observe that the Defendant Miller has made no attempt to argue that his issue is not waived for failing to raise it in his motion for new trial, instead, arguing only that it is not waived for failing to include a transcript of the motion to suppress hearing. Nonetheless, we will turn our attention to the application of the Adkisson factors.

Analyzing the first factor, we conclude that the Defendant has failed to establish clearly what occurred in the trial court by failing to properly include in the record on appeal the wiretap application and a transcript of the motion to suppress hearing. The Defendant contends that, "[a]ll that occurred on April 23, 2008 when the motion was docketed was for the [Defendant] to verify that the issuing magistrate was his former attorney in a drug case [a fact that could have been documented by reference to the exhibits attached to the . . . motion to suppress]." However, the motion to suppress order prepared by the trial judge belies this contention, providing as follows: "The [c]ourt held a hearing on April 23, 2008, and the State filed its written response the dame day . . . . After hearing the evidence, the [c]ourt orally denied the suppression motion from the bench, noting that a brief written order would subsequently follow." Only a transcript could clearly establish what actually occurred on April 23, 2008. Moreover, it seems axiomatic that inclusion of the wiretap application was paramount for substantive appellate review of the Defendant's issue.

Second, we examine whether the record demonstrates that a clear and unequivocal rule of law was breached. The State argues that, because this is an issue of first impression in Tennessee, it is impossible for the trial court to have breached a clear and unequivocal rule of law. However, the requirement that a neutral and detached magistrate issue a warrant emanates from the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution, which protect against unreasonable searches and seizures. See State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999). The fact that Tennessee appellate courts have yet to address its application to our Wiretap Act does not negate the constitutional rule of law.

-7-

Turning to that rule of law and its application to the present case, the trial court relied upon federal law for guidance and concluded that

> the fact a judge previously served as defense counsel for a defendant while in private practice does not per se invalidate that the same individual can be [a] neutral and detached judge when issuing a search warrant or, as is the case here, a wiretap authorization order, for a subsequent case. There has been no evidence presented to this [c]ourt that Judge Watkins was biased or impartial when issuing the wiretap authorization against [the] Defendant.

We agree with the trial court, finding federal law to be sufficiently persuasive authority on the subject. See e.g., United States v. Barry-Scott, No. 05-4464, 2007 WL 3129723, at *8 (6th Cir. Oct. 25, 2007) (judge issuing warrant found to be neutral and detached even though he had previously represented defendant and her husband on criminal charges and was aware of their drug activities). Concluding that the first two Adkisson factors are not satisfied, we decline plain error review and find it unnecessary to proceed to the remaining factors.

## B. Hearsay

The Defendant Turner also challenges admission of testimony regarding the tape-recorded conversations via the wiretap. His precise argument is unclear. He states, in his issues presented for review, that the trial court erred in allowing testimony "that the telephone calls alleged to have been made by the Defendant were actually the Defendant, or that the cell phone itself actually belonged to the [Defendant.]" He then claims that this testimony was hearsay. In the argument portion of his brief, the only reference he makes to these recordings is that the recorded conversations "contain no evidence of drug transactions, merely what some witness claimed were 'code' words for drugs and money." He then asserts that the State's case was based upon "hearsay statements."

The States argues that this issue waived for failing to make a contemporaneous objection. We note that the Defendant Turner filed no motion to suppress or motion in limine regarding the tape-recorded conversations or testimony related thereto. Moreover, we are unable to discern from the record an ostensible objection raising the issue the Defendant now asserts on appeal, and the Defendant has made no reference to the record pointing to such an objection. See Tenn. R. App. P. 27(a). As an anomaly, we point out that the Defendant did raise the issue in his motion for new trial; however, the motion was denied, and the trial court did not further expound upon the issue.

Regardless of any waiver, we conclude that any challenge to Agent Smitherman's testimony identifying the voices on the recordings, stating who used each phone, and explaining the meaning of certain terms used in drug-related conversations is without merit.

All of these statements are admissible law enforcement agent testimony. A law enforcement officer experienced in wiretap interceptions may give testimony about specifics such as these when that officer is personally knowledgeable of these facts. Additionally, this Court has previously held that a narcotics officer may testify about the language used by drug dealers. See State v. Carey, 914 S.W.2d 93, 96 (Tenn. Crim. App. 1995).

The Defendant also appears to challenge admission of evidence on the ground that he perceives the testimony to be "hearsay" and lacking foundation. The Defendant did raise several hearsay objections at trial to evidence obtained from the wiretap; however, the Defendant only challenged as hearsay messages relayed to officers in the field from the wireroom. The trial court overruled the Defendant's objections, concluding that the messages were not introduced for the truth of the matter asserted but to explain the officers' subsequent actions. We agree with the trial court. Moreover, we note that testimony and evidence from the recordings are not hearsay or fall within exceptions to the hearsay rule. For example, a party's own statement in either an individual or a representative capacity is not excluded by the hearsay rule. See Tenn. R. Evid. 803(1.2)(A). Additionally, many of these calls contain co-conspirator statements, likewise an exception to the hearsay rule: "[A] statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." See Tenn. R. Evid. 803(1.2)(E). Therefore, these statements were not excluded by the hearsay rule.

## II. Testing of Substance

The Defendant Miller argues that the trial court abused its discretion when it permitted Det. Kajihara, in the presence of the jury, to "field test" the substance, previously undetected by officers, retrieved from the box containing the digital scales. The Defendant alleges that it was error because the substance had not been revealed in the discovery process and there was no chain of custody established for the substance.

Agent Talley testified that he was involved in the search of the Defendant Turner's residence and was responsible for the collection of evidence. On top of a dresser in the Defendant Turner's master bedroom, Agent Talley found a set of digital scales inside a box, which he testified could be used for weighing drugs. The scales and the box were admitted into evidence without objection. On cross-examination, Agent Talley testified that he had not detected any cocaine residue on the scales. On redirect, the State asked, "Today when you were jostling the box around that contained the scales did you see anything that was unusual?" Agent Talley replied, "Yes, sir. I noticed a white, chunky substance in the box that I've not previously seen." Agent Talley affirmed that he first found the substance upon examining the scales in front of the jury and that he had not touched the substance or "tried to feel it in any way." The trial court then directed Agent Talley to "rake" the substance into a plastic bag. Later in the trial, Det. Kajihara testified that he was experienced in using

cocaine "field-test" kits and relayed that he had brought a test kit with him at the State's request. At that time, the State asked that Det. Kajihara be allowed to test the substance found in the box. The Defendants objected, arguing that the chain of custody had not been established and that the substance had not been disclosed in the discovery process. The trial court overruled the objection finding that the substance was "part of the exhibit" and that the Defendants' argument went to the weight of the evidence, not its admissibility.

### A. Chain of Custody

As for the chain of custody of the substance, the Defendant Miller points to the facts that the box "supposedly laid around somewhere for two years" and the substance was "undiscovered" by authorities and that "the record is silent relative to where this substance was and how it was secured from the time it was allegedly discovered . . . and the time it was tested . . . the next day." Thus, he submits that "said demonstration in the presence of the jury so prejudiced the panel" that his right to a fair and impartial trial was violated, entitling him to a new trial.

We begin our analysis by first noting that the standard of review for this issue is one of "sound discretion of the trial court, and the court's determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion." State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000); see also State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987). We conclude that the record on appeal supports the trial court's findings.

In order for tangible material to be admitted into evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). The purpose of the chain of custody requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). However, this Court has also ruled that the State is not required to "establish facts which exclude every possibility of tampering," but rather must establish circumstances that "reasonably assure the identity of the evidence and its integrity." Kilpatrick, 52 S.W.3d at 87. In other words, the chain of custody rule "does not require absolute certainty of identification." Id. (citing Ritter v. State, 462 S.W.2d 247 (Tenn. Crim. App. 1970)). Rather, "[r]easonable assurance, rather than absolute assurance, is the prerequisite for admission." Id.

The Defendant has failed to point to any facts which suggest the integrity of the evidence was impugned in any way. There was no objection to admission of the box and scales as an exhibit, and the box and scales were accounted for in Agent Talley's records. Agent Talley testified that he first noticed the white substance upon examining the scales in front of the jury. Agent Talley affirmed that he had not altered the substance by touching it.

The trial court then directed Agent Talley to rake the substance into a plastic bag. The record indicates that the substance was then in possession of the trial court until tested by Det. Kajihara the next day. The record establishes reasonable assurance that the substance admitted at trial was in the box found at the Defendant Turner's residence and was not tampered with.

Therefore, we conclude that the trial court did not abuse its discretion in determining that the chain of evidence was sufficient to allow field-testing of the substance and its admission into evidence at trial. Moreover, we note that the substance tested was a small amount of cocaine and found at the Defendant Turner's residence. Given the large amounts of cocaine involved in this case, the strong case of the State, and the fact that the substance was not connected to the Defendant Miller, any error was harmless. This issue is without merit.

### B. Discovery Violation
The Defendant Miller further asserts that the trial court should have excluded the substance from evidence because of the State's failure to produce it before trial. Under Rule 16(a)(1)(F) of the Tennessee Rules of Criminal Procedure, upon request of a defendant, the State shall permit a defendant to inspect and copy or photograph documents and objects within the possession, custody or control of the state, and which are material to the preparation of a defendant's defense, are intended for use by the state as evidence in chief at the trial, or were obtained from or belonged to the defendant. Tenn. R. Crim. P. 16(a)(1)(F). Additionally, section (c) of Rule 16 imposes a continuing duty to disclose discoverable items of evidence.

Although Rule 16(d)(2) does provide that the court may "prohibit the party from introducing evidence not disclosed," Tennessee Rules of Criminal Procedure 16(d)(2), this Court has held that excluding evidence for a Rule 16 violation is a "drastic remedy and should not be implemented unless there is no other reasonable alternative." State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). The evidence should not be excluded unless the Defendant was prejudiced by the discovery violation itself. Id.; see also State v. Cottrell, 868 S.W.2d 673, 677 (Tenn. Crim. App. 1992). As for any discovery violation, when arguing that the State has violated Rule 16, a defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, 2002 WL 140059, at *56 (Tenn. Crim. App., Knoxville, June 28, 2002) (quoting State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992)).

It appears that both the Defendants would have been aware of items discovered at the Defendant Turner's residence during the execution of the search warrant; thus, presumably

aware that the State intended to introduce the box and digital scales as an exhibit at trial. The exhibit was available to the defense for inspection; there is no allegation that the State failed to disclose the digital scales and the box during discovery or that the State intentionally failed to record the substance inside the box. Agent Talley testified that he just discovered the substance while "jostling" the box, which was brought from the property room. The court took possession of the substance following its discovery. We conclude that the Defendant was not prejudiced by the State's failure to produce this substance prior to trial. Again, if there was any error by the trial court in this regard, it was harmless.

## III. Drug Ledgers

Next, the Defendant Turner submits that it was error to permit the State to enter into evidence "drug ledgers" found inside his residence; he referred to them as "undated scribblings." He contends that these ledgers "were irrelevant to the alleged drug conspiracy and possession of cocaine charges in this case." The Defendant asserts that the State did not prove the ledgers were his; they were found inside his wife's apartment. The Defendant's wife testified at trial that she and the Defendant were separated, and he was not living there at the time of the search.[3]

Agent Talley testified that, while searching the Defendant Turner's residence, he discovered five notebooks ("drug ledgers") inside the kitchen garbage can: one large composition book and four smaller notebooks. Agent Talley saw the initials K.D. in the notebooks, which was a nickname for the Defendant Miller. Agent Smitherman examined the evidence after it was recovered. Although the ledgers were undated, the ledgers did contain a list of the Defendant Turner's customers, including amounts owed.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

---

[3] Interestingly enough, the Defendant does not challenge any of the other evidence recovered from this residence on this ground.

First, we note that, while the Defendant Turner filed a motion in limine to excluded the ledgers, it does not appear in the record on appeal where this motion was brought to the trial court's attention.[4] Moreover, the Defendant does not cite to the record wherein he raised a contemporaneous objection at trial, and we can find none. The Defendant has waived the issue. See Tenn. R. App. P. 36(a). Nonetheless, both Agents, experienced narcotics investigators, testified that the notebooks were "drug ledgers," in which the Defendant recorded who owed him money and how much they owed. Agent Smitherman was able to confirm some of the entries based upon intercepted phone calls. The ledgers were found in the kitchen garbage can of the residence; the Defendant Turner's argument that the notebooks did not belong him went to the weight, not the admissibility, of the evidence. It was established that the Defendant Turner frequented the apartment, and additional items were found indicating a large drug operation. We conclude that the evidence was relevant to the existence of a conspiracy between the Defendants and its probative value was not outweighed by any other considerations. The trial court did not abuse its discretion in admitting the notebooks into evidence.

## IV. Sufficiency

On appeal, the Defendants raise several challenges to the sufficiency of the evidence supporting their respective convictions.[5] The crux of their claim is that the accomplice testimony of Kavares Davis was not corroborated. The Defendant Turner asserts that the trial court erred in denying his motion for judgment of acquittal on all counts of the indictment.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime

---

[4] At the motion for new trial hearing, the trial court stated, "The motion in limine, I addressed that, and I gave my reasons for that."

[5] The Defendant Miller does not appear to challenge his possession with intent to deliver conviction, which was based upon the cocaine recovered from his residence during the search.

beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom.  See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599.  A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence.  See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659.  Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact.  See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.  Moreover, on appellate review of a denial of a motion for judgment of acquittal, we apply the same standard as a question of the sufficiency of the convicting evidence.  See, e.g., State v. Brewer, 945 S.W.2d 803, 805 n.2 (Tenn. Crim. App. 1997).

It is an offense for a defendant to knowingly deliver a controlled substance.  See Tenn. Code Ann. § 39-17-417(a)(3).  Cocaine is a Schedule II controlled substance and, if the amount involved is 300 grams or more, then the offense is a Class A felony.  See Tenn. Code Ann. §§ 39-17-417(c), (j)(5).  "'Deliver' or 'delivery' means the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship."  Tenn. Code Ann. § 39-17-402(6).  To establish a conspiracy, the State was required to prove the following:

> The offense of conspiracy is committed if two or more people, each having the culpable mental state for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of the offense, agree that one or more of them will engage in conduct which constitutes such offense.

Tenn. Code Ann. § 39-12-103(a).  "No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired."  Tenn. Code Ann. § 39-12-103(d).

The Defendants argue that State failed to provide sufficient evidence to corroborate the accomplice testimony of Kavares Davis.  It is well settled that, "[i]n Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797,

803 (Tenn. 1994)). This "very salutary rule" is designed to prevent the "obvious dangers" of allowing a defendant to be convicted solely on the basis of an accomplice's testimony. Sherrill v. State, 321 S.W.2d 811, 814 (Tenn. 1959). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate the testimony of an accomplice. State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984).

With respect to the nature, quality, and sufficiency of the evidence necessary to corroborate an accomplice's testimony, this Court has held as follows:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.
>
> . . . .
>
> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplices testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

State v. Griffis, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (citations omitted).

The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). In other words, the corroboration must include some fact establishing the identity of the defendant as a criminal actor. State v. Boxley, 76 S.W.3d 381, 387 (Tenn. Crim. App. 2001). It is generally for the trier of fact to determine whether sufficient corroboration exists.

-15-

Id. (citing Shaw, 37 S.W.3d at 903). However, as this Court has previously pointed out, "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony." Id. (quoting Griffis, 964 S.W.2d at 589).

Pursuant to the wiretap order and police intercepted phone calls, officers believed that the Defendant Miller would be meeting with an individual from Kentucky at the Rivergate Mall for a drug transaction on March 24, 2006. Kavares Davis testified that the Defendant Turner delivered three kilos of cocaine to the Defendant Miller on March 23; however, one of these kilos was "bad," so the Defendant agreed to replace it the following day. On the morning of March 24, the wireroom intercepted a phone call between the Defendants, wherein the Defendant Miller asked the Defendant Turner to "come and drop it off." According to Davis, the Defendant Turner arrived at the apartment that morning with the replacement kilo of cocaine. He stated that he let the Defendant Turner in through the garage and that, after the sale was concluded, they stood outside of the apartment and talked for a little while. Officers observed all of these coming and goings at the apartment and noticed the blinds being closed once the Defendant Turner was inside the residence.

Davis testified that, later that day, he followed the Defendant Miller to the Rivergate Mall. Officers intercepted a call between Davis and the Defendant Miller while the Defendant Miller was inside the food court. Based on observations made by officers watching the Defendant Miller, it appeared a transaction had occurred between the male in the vehicle with Kentucky plates, later identified as Ned Wayne Thompson, and the Defendant Miller. Detective Kajihara saw Thompson put something inside the trunk of his car while he was stopped at a gas station. Thompson was then pulled over for speeding and, upon a search of the vehicle, officers located two separately packaged kilos of cocaine.

The Defendant Miller and Davis met at a Mapco gas station and proceeded to the Defendant Turner's residence. The Defendant Miller first went inside. He then came back outside, put a bag inside his coat, and returned inside the residence.

After the procurement of search warrants, officers found drugs and/or drug paraphernalia at the Defendants' residences. Much of the evidence was used in the resale process. During the time officers were intercepting the Defendants' calls, the Defendants used coded language common to drug dealers, setting up meetings to sell drugs and obtain money. Both Defendants had drug ledgers to record which customers owed money and how much was owed. Moreover, at the March 10 pull of the Defendant Miller's trash, items common for use in drug dealing were discovered.

From consideration of the proof in the record before us, we find the evidence sufficient to corroborate the testimony of the accomplice Kavares Davis. The accomplice's

-16-

testimony was corroborated by the taped telephone conversations, officers observations, and the evidence recovered from the respective residences. This issue is without merit.

**V. Sentencing**

The Defendant Miller contends that the trial court erred in setting the length of his individual sentences and in ordering him to serve consecutive sentences. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

Agent Smitherman testified at the sentencing hearing. She reiterated that she was involved in a narcotics investigation involving the Defendant Miller. The investigation began in December 2005 following the discovery of a body in White County. According to Agent Smitherman, State records showed that the Defendant Miller had not been employed in many years, and there were no wages reported to social security. When asked if she ever saw the Defendant go to work while he was under surveillance, she stated that she did not. A search of the Defendant Miller's residence did not reveal any legitimate source of employment. She observed receipts where the Defendant had spent large amounts of cash, purchasing such things as cars, electronics, jewelry, and furniture. According to Agent

-17-

Smitherman, the Defendant lived in a "nice" apartment complex. The lease agreement reflected that the Defendant earned $5,600 a month from two business; however, these businesses were operated by relatives, and Agent Smitherman did not believe the Defendant to be employed at these locations.

The thirty-four-year-old Defendant Miller testified that he had two children and that he had been supporting them until his incarceration. He relayed, "I did things that's inappropriate for wages . . . ." He was last gainfully employed at Ticketmaster until his termination in 2003. He claimed that he did not buy his Rolex watch with drug proceeds and that he did not purchase the Hummer or Chevrolet Impala, which belonged to other people. The Defendant acknowledged that he had previously violated a community corrections sentence. He also admitted that he never worked at the businesses listed on the apartment lease.

The presentence report reflected that, in addition to the felony convictions used to establish is Range II classification, the Defendant had five misdemeanor convictions for reckless driving, violation of the driver's license law, evading arrest, and driving while his license was revoked. The amended judgment form (for selling over twenty-six grams of cocaine) entered into evidence for range classification purposes also indicated that the Defendant had a probation violation sustained for that conviction, and he had to serve his eight-year sentence. The presentence report also showed that the Defendant had previously been given an opportunity to participate in numerous rehabilitation programs.

### A. Length
The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long
> as the length of the sentence is "consistent with the purposes and principles of
> [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes
> and principles include "the imposition of a sentence justly deserved in relation
> to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a
> punishment sufficient "to prevent crime and promote respect for the law,"
> [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's
> "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] §
> 40-35-103(5).

Id. (footnote omitted).

-18-

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

The Defendant was convicted of three Class A felonies. As a Range II, multiple offender, each offense carried a sentence of twenty-five to forty years. See Tenn. Code Ann. § 40-35-112(b)(1). In setting the length of each of the Defendant's sentences, the trial court found three enhancement factors to be applicable. First, the trial judge found that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range, noting that the Defendant had prior misdemeanor convictions. See Tenn. Code Ann. § 40-35-114(1). The trial court also determined that the Defendant was a leader in the commission of the offense involving two or more criminal actors: "Not necessarily the only leader, but he was clearly a leader in the commission of these offenses." See Tenn. Code Ann. § 40-35-114(2). Finally, the trial court noted the prior revocation of the Defendant's community corrections sentence and, thus, concluded that he had failed to comply with the conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-114(8). In mitigation, the trial court found that the Defendant's conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1). The trial court then imposed a forty-year sentence for each conviction, ruling as follows:

> I'm not going to give any weight at all to the [mitigating factor] and I am going to consider your criminal convictions, the fact that you are—had been involved in release into the community for the very same thing and that you were a leader in the offense. The prior misdemeanor convictions are not that great.

-19-

But you were the leader in this offense, and you had been previously involved in a release where the [c]ourt tried to kind of help you out.

**B. Consecutive Sentencing**

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In addition to these criteria, consecutive sentencing is also subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed," that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and that the defendant's "potential for rehabilitation" be considered. Tenn. Code Ann. § 40-35-103(2), (4) and (5). Additionally, we are advised that "the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of a number of criteria by a preponderance of the evidence. In this case, the trial court ordered consecutive sentences based on its finding that the Defendant "is a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood." See Tenn. Code Ann. § 40-35-115(b)(1). Applying State v. Wilkerson,[6] 905 S.W.2d 933, 939 (Tenn. 1995), the trial court also determined that the overall sentence related to the severity of the offenses and was necessary to protect the public from further criminal conduct by the Defendant.

### C. Appellate Review

Our review reveals that the trial court considered the sentencing principles and all relevant facts and circumstances, and correctly applied enhancement factors. The trial court properly enhanced the Defendant's sentence based upon his criminal history and because he failed to comply with the conditions of a sentence involving release into the community. According to the presentence report, the Defendant had five misdemeanor convictions and a prior probation violation. The Defendant admitted to violating the terms of a prior community corrections sentence. The trial court was also justified in finding that the Defendant was a leader in the commission of the offense based upon the testimony presented at trial. Being a leader in the commission of an offense involving two or more criminal actors is not an element of the offense of conspiracy. Conspiracy involves an agreement between two or more persons to engage in a criminal act; conspiracy does not require that the State prove leadership in the criminal act. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App.1995); State v. Little, 854 S.W.2d 643, 652 (Tenn. Crim. App. 1992) (applying enhancement factor (2) to conspiracy convictions). These three enhancement factors are sufficient to support the enhanced sentences. The weight to be given these factors, as well as the mitigating factor, are within the trial court's discretion.

_____

[6] The trial court noted that the Wilkerson factors were only required to be applied when the trial court determined the Defendant to be a "dangerous offender"; however, the trial court chose to apply those factors anyway.

Morever, the evidence supports the trial court's finding that the Defendant was a professional criminal who knowingly devoted his life to criminal acts as a major source of livelihood. Agent Smitherman's testimony provided ample grounds to support this finding. Because consecutive sentencing is warranted when at least one of the statutory criteria exists, see State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995), the record supports the imposition of consecutive sentences.

The thirty-four-year-old Defendant had spent much of his adult life in the criminal court system and had no significant employment history. Additionally, the trial court concluded that the overall sentence related to the severity of the offenses and was necessary to protect the public from further serious criminal conduct by the Defendant. We note that, in addition to his prior probation violation, the Defendant had previously been given opportunities to participate in rehabilitation programs, obviously to no avail.

We conclude that the trial court did not err or abuse its discretion in setting the Defendant's sentences at forty years. We further conclude that the trial court did not err or abuse its discretion by ordering consecutive sentences. The Defendant is not entitled to relief on this issue.

**Conclusion**

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court as to both of the Defendants' convictions and sentences.

_____
DAVID H. WELLES, JUDGE